<div style="text-align:center">

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

</div>

| | |
|---|---|
| NARCISO FUENTES,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>DISH NETWORK L.L.C.,<br><br>　　　　　Defendant. | Case No. 16-cv-02001-JSW<br><br>**ORDER RESOLVING CROSS-MOTIONS FOR SUMMARY JUDGMENT AND SETTING STATUS CONFERENCE**<br><br>Re: Dkt. No. 155, 157 |

Now before the Court for consideration are the cross-motions for summary judgment, filed by Plaintiff Narciso Fuentes ("Fuentes") and Defendant Dish Network L.L.C. ("Dish"). The Court has considered the parties papers, relevant legal authority, and the record in this case, and the Court HEREBY GRANTS, IN PART, AND DENIES, IN PART, Dish's motion, and GRANTS Fuentes' motion.

<div style="text-align:center">

**BACKGROUND**

</div>

Fuentes' claims against Dish are based on alleged violations of four California statutes: the Home Solicitation Sales Act ("HSSA"), Translation Act ("CTA"), the Consumer Legal Remedies Act ("CLRA"), and the Unfair Competition Law ("UCL"). The facts, which are undisputed unless otherwise noted, supporting these claims are as follows:

On or about August 1, 2015, Fuentes, who speaks Spanish, received a Spanish language postcard in the mail advertising Dish's satellite television service for $19.99 per month for 12 months. The postcard included other terms and conditions, in small print, including the following: (1) if service was terminated during the first 24 months, a cancellation fee of $20 per month remaining on the contract would apply; and (2) the prices for certain equipment. (Dkt. No. 155-3,

<div style="text-align:center; font-size:small">United States District Court<br>Northern District of California</div>

Declaration of Clifford E. Yin ("Yin Decl."), ¶ 5, Ex. A (Deposition of Narciso Fuentes ("Fuentes Depo.") at 73:5-20, 75:21-77:23; Dkt. No. 155-4, Fuentes Depo. Ex. 41.)

Dish has some month-to-month subscription options, and those customers pay Dish's full retail rates and purchase Dish's equipment.  In order to determine if a customer qualifies for promotional rates and the option to lease equipment, Dish will run a credit check, with a customer's permission.  (Dkt. No. 156-4, Declaration of Elliot Conn in Support of Motion for Summary Judgment ("Conn MSJ Decl."), ¶ 9, Ex. H (Deposition of Mark Vervaet ("Vervaet Depo.") at 13:17-22, 39:7-41:5; Dkt. No. 168-1, Declaration of Elliot Conn in Opposition to Dish Motion for Summary Judgment ("Conn Opp. Decl."), ¶¶ 3-4, Ex. B (Deposition of Paul Orban ("Orban Depo.") at 20:11-21:14, 46:17-22, 47:1-10), Ex. C (Deposition of Shannon Picchione ("Picchione Depo.") at 16:16-25, 18:7-12, 22:3-23:18, 25:16-26:18, 31:24-33:8.)

On August 2, 2022 Fuentes called Dish, spoke with its employee Claudia Flores, and asked whether the offer of $19.99 per month was "with a contract? … or, is it more on a monthly basis." Flores asked Mr. Fuentes some questions about the type of televisions he had in his home and what type of programs he liked to watch.  She then advised Fuentes that to determine if Dish could give him the promotion, she would need to run a credit check, and Fuentes gave permission to run it.  (Dkt. No. 155-14, Declaration of Jodeci Guzman ("Guzman Decl."), ¶¶ 2, 5-6, Exs. C-D (Transcripts of Recordings on 8/2/15 ("8/2/15 Tr.") at 1-7).)[1]  Flores then advised Fuentes he qualified for two offers, both of which required two year terms: (1) a fixed price for both years; and (2) a discounted price during the first year that would increase during the second.  Flores also explained that the $19.99 offer was for one TV and represented the cost of the programming without a digital recorder.  (8/2/15 Tr. at 8-9.)  Fuentes did not subscribe that day because Dish could not offer him $19.99 per month for one year.  (Fuentes Depo. at 72:9-12.)

On August 6, 2015, Fuentes called Dish again and spoke with Paulina Nunez ("Nunez"). (Guzman Decl., ¶¶ 3-4, Exs. A-B (Transcripts of Recordings on 8/6/15 ("8/6/15 Tr."); *see also* Fuentes Depo. at 52:20-53:8).)  Fuentes testified that he called Dish again because he wanted to

---

[1]    When the Court quotes from a transcript, it is quoting from the English translation.

determine if he could get a one-year contract.  (Fuentes Depo. at 75:317.)  Like Flores, Nunez advised Fuentes she would need to run a credit check in order to determine what offers would be available, and Fuentes consented.  (8/6/15 Tr. at 2-5.)  When Nunez pulled up the offers available to him, she also referred Fuentes to the small print on the postcard regarding the prices for equipment, and Fuentes acknowledged those prices.  (*Id.* at 6-7.)  Nunez advised Fuentes about an offer would give him a promotional rate of $19.99 for the first year, plus $12.00 for the "Hopper equipment." (*Id.* at 7.)[2]  Nunez also explained that Fuentes would receive three months of certain premium channels and six months of protection for the equipment for free, but if he did not want to be charged for those items, he would need to cancel them on or before the trial periods ended. (*Id.* at 20-22.)

Nunez advised Fuentes she was "going to go over the clauses of the plan" and advised Fuentes that: "all of the equipment is rented;" there would be a charge for unreturned equipment; he had "selected the offer of savings for the first year, upon signing up"; and Dish would "automatically charge" him for the amount due.  Nunez asked Fuentes if he wanted to sign up, and he said, "Uh-huh.  All right."  (*Id.* at 24.)  Nunez then advised Fuentes that the "price of the package" was $19.99 for the first year and when that promotional period was over it would be $44.99 per month, that he needed to keep the premium channels for three months "to receive this offer," that he would be charged extra for those channels if he did not cancel after three months, and that he would receive the protection plan free for six months, but after six months he would be charged extra for that service, unless he cancelled.

Nunez also advised Fuentes that "[b]y receiving these offers, you are going to accept a 24-month contract. … If you break this agreement, you will be charged for early termination, for the cost of $20 for each month that you have your contract," and that his initial bill would be $31.99. (*Id.* at 25.)  Nunez also stated, "…all the prices, programming, functionality, offers are subject to change.  Dish may increase your monthly bill at any time.  However, the price of your programming package is protected for 12 months. Okay?"  Nunez asked Fuentes if he "agree[d] to

---

[2]      Nunez actually stated that the price was "20 dollars" plus the equipment.  (*Id.* at 7-9.)

all the terms and conditions [she] just read[.]"  Fuentes said, "Yes, all right."  (*Id.*; *see also*

Fuentes Depo. at 77:20-23, 93:3-95:12.)

At the end of the August 6 phone call, Nunez and Fuentes had the following exchange:

NUNEZ:  Anything else I can help you with?

FUENTES: Yes.  Well, well sure, everything is fine.  So just 3 more months, and then cancel the movies and 12 months and it will be $31.99, right?

NUNEZ: Correct.  Mm-hmm.

FUENTES: Uh-huh.  Okay.  So then after 12 months, it … if, if I don't cut it off, they would charge as normal, right?

NUNEZ:  Correct.  Uh-huh.

FUENTES: Uh-huh.  Yes … no, well, I'll call before the 12 months are up.

NUNEZ: Correct.  Mm-hmm.

FUENTES: You know?  Oh, all right.

NUNEZ: Okay?

FUENTES: Uh-huh.

NUNEZ: So that would be all set then.  Okay?  Welcome to the Dish family.  Well, remember that the discount, so, it's for just 12 months.  Afterwards, you, the contract, it can terminate, you know? But ,well sure…

FUENTES:  Uh-huh.  All right.

NUNEZ: But as I told you, 24 months, the discount for 12 full months. Okay?

FUENTES: Uh-huh.  All right.

(8/6/15 Tr. at 35.)

On August 8, 2015, a Dish technician came to Fuentes' home to install the necessary

equipment and to activate the service.  It is undisputed that the technician did not speak Spanish.

Fuentes testified the technician spent two to three hours installing the equipment and then,

pursuant to Dish's practices, presented Fuentes with a tablet that contained an electronic version of

Dish's Digital Home Advantage Plan Agreement ("DHAP"), in English, and an English language

version of a brochure that contains Dish's Residential Customer Agreement, which incorporates

4

United States District Court
Northern District of California

the DHAP by reference.  (Fuentes Depo. at 129:4-130:11, 188:16-21; Conn MSJ Decl., ¶¶ 2, 8, Ex. A (Fuentes Depo. Ex. 42 (RCA and DHAP), Ex. G (Deposition of Megan Casados ("Casados Depo.") at 57:10-58:2).)  Dish requires a customer to sign the DHAP, either on paper or electronically, in order to receive service, and customers normally sign the DHAP at the location where the service is installed.  (Casados Depo. at 73:14-75:4, 79:18-24.)

Because the document on the tablet was in English, Fuentes was not able to read it but "saw a lot of 24s."  (Fuentes Depo. at 125:3-23, 150:24-151;1.)  Fuentes told the technician that he did not want to sign and, according to Fuentes, the technician told him to sign the document and "call the company and handle that."  (*Id.* at 123:4-126:16.)  Fuentes also testified that he did not know how to ask for a Spanish version of the document and could not ask his wife, who speaks English, for assistance because she was in the shower.  However, Fuentes also testified that he did not ask for assistance when his wife was available.  (Fuentes Depo. at 124:19-23, 126:12-24.)  The Dish technician did not – and could not – provide Fuentes with a Spanish version of the DHAP because it is not available on Dish's tablets.  (Casados Depo. at 62:1-10 79:18-24, 109:19-110:1.)

According to Fuentes, he signed the DHAP because even though he saw the references to 24 months, he believed he had reached an agreement with Nunez for a one-year contract.  Fuentes called Dish within a few days to "handle that issue," and it is undisputed that Fuentes was not able to modify the term of his contract.  (*Id.* 130:20-25, 139:12-20, 211:18-25, 213:1-7; *see also* Conn MSJ Decl., Ex. D (Declaration of Narciso Fuentes in Support of Motion for Class Certification, ¶¶ 7-11).)  It also is undisputed that Fuentes' DHAP and the RCA contain terms and conditions in addition to the terms Nunez read during the telephone call with Fuentes.  Fuentes terminated his Dish subscription in August 2017 and has not subscribed since that time.  (Fuentes Depo. at 45:11-19, 237:1-9).)

The Court will address additional facts as necessary in the analysis.

//

//

//

//

5

1

United States District Court
Northern District of California

## ANALYSIS

**A.    Applicable Legal Standards.**

"A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a).  Where, as here, "parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations and internal punctuation marks omitted).  A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment, or partial summary judgment, is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court may not weigh evidence or make determinations of credibility.  Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c).  An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson*, 477 U.S. at 248-49.  A fact is "material" if it may affect the outcome of the case. *Id.* at 248.  If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, the party must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party meets its initial burden, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).  It is not the Court's task "to scour the record in search of a genuine issue of triable

fact." *Id.* (quoting *Richards*, 55 F.3d at 251); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted).  If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

**B.      Evidentiary Issues.**

      **1.      Fuentes' Requests for Judicial Notice.**

Fuentes asks the Court to take judicial notice of pleadings and declarations filed by Dish in two unrelated cases: *Nordeman v. Dish Network, LLC*, 21-cv-923-TSH (N.D. Cal.) and *Miller v. Dish Network, LLC,* No. 17-cv-432-REP (E.D. Va).  (*See* Dkt. Nos. 157-2, 168-2.)  The Court can take judicial notice of the existence of court documents and of the fact that certain statements were made, but it cannot take judicial notice of disputed facts.  *See, e.g., Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).  Dish objects to the Court's consideration of these documents and argues Fuentes is relying on statements contained in those pleadings that do not pertain to his transaction.  The Court did not rely on the pleadings and declarations in the *Nordeman* case to resolve the motion.  Accordingly, Dish's objections to those requests are moot.

Fuentes asks the Court to take judicial notice a motion to dismiss in *Miller*, in which Dish argued it had a "permissible purpose" under the Fair Credit Reporting Act to run credit checks.  In that brief, Dish cited 15 U.S.C. section 1681b(A)(3)(A), which allows a person to run a credit check in connection with an extension of credit.  Fuentes argues these statements support his claims under the CTA.  "[S]tatements of fact contained in a brief may be considered admissions of the party in the discretion of the district court." *Am. Title Co. Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1987).  However, the Court does not construe the statement on which Fuentes relies as a statement of fact or an admission by Dish that it runs credit checks because it is extending credit to customers.  Instead, the statement is best construed as counsel's argument

United States District Court
Northern District of California

1    responding to the plaintiff's allegations.  The Court SUSTAINS Dish's objection, and it takes

2    judicial notice only of the existence of the brief and that the statement was made.

3            **2.      Dish's Request for Judicial Notice.**

4            Dish asks the Court to take judicial notice of portions of the HSSA's legislative history.

5    Although Fuentes has not objected, the Court denies the request.  To the extent the HSSA is

6    ambiguous, the Court may consider legislative history as part of its analysis.  *See, e.g. Floyd v.*

7    *Am. Honda Motor Co.*, 966 F.3d 1027, 1034 (9th Cir. 2020); *Klein v. United States*, 50 Cal. 4th

8    68, 77 (2010).

9    **C.      Fuentes is Entitled to Judgment on the HSSA Claim.[3]**

10           It is undisputed that Fuentes' DHAP and RCA did not comply with the HSSA, which

11   requires that a contract falling within its scope include information about a buyer's right to cancel

12   and be written in the same language as an oral sales presentation.  See Cal. Civ. Code §§

13   1689.6(a)(1), 1689.7(a)(1)(c).  "Until the seller has complied with this section the buyer may

14   cancel the home solicitation contract or offer."  *Id.* § 1689.7(g).  The parties' dispute centers on

15   whether the contract falls within the scope of the HSSA.

16           A "[h]ome solicitation contract or offer" means "any contract, whether single or multiple,

17   or any offer which is subject to approval, for the sale, lease, or rental of goods or services or both,

18   made at other than appropriate trade premises in an amount of twenty-five dollars ($25) or more,

19   including any interest or service charges."  *Id.* § 1689.5(a).  "[A]ppropriate trade premises" means

20   "premises where either the owner or seller normally carries on a business, or where goods are

21   normally offered or exposed for sale in the course of a business carried on at those premises."  *Id.*

22   § 1689.5(b).  In order to determine whether the parties entered the contract at an "appropriate trade

23   premises," the Court looks to whether that took place "somewhere other than the [Dish's] place of

24   business."  *Louis Luskin & Sons, Inc. v. Samovita*, 166 Cal. App. 3d 533, 536 (1985); *see also*

25   *Weatherall Alum. Products Co. v. Scott*, 71 Cal. App. 3d 245, 248 (1977).

26   _____

27   [3]       The parties filed cross-motions for summary judgment on the HSSA claim.  Dish argues
     Fuentes' cross-motion is procedurally improper because he raises arguments about Dish's
28   practices as a whole, even though the Court denied Fuentes' motion for class certification.  The
     Court has limited its analysis to Fuentes' transaction with Dish.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Dish argues the contract was formed during Fuentes' telephone call with Nunez on August

2   6, and Fuentes argues there was no contract until he signed the tablet at his home.  Under

3   California law, "an oral contract consummated over the telephone is deemed made where the

4   offeree utters the words of acceptance." *Travelers Ins. Co. v. Workmen's Compl. App. Bd.*, 68

5   Cal. 2d 7, 14 (1967); *see also People v. Toomey*, 157 Cal. App. 3d 1, 14 (1984) ("We recognize

6   that telephone solicitations do not result in an intimidating presence of the seller in the buyer's

7   home to the extent found in a 'door-to-door' sale; yet the same pressure to make an immediate

8   decision arises from such solicitations, justifying the protection of the home solicitation sales

9   Act—particularly its three-day cancellation provision.").

10   Dish argues that Fuentes was the "offeror," but the Court is not persuaded.  Although

11   Fuentes initiated the call to Dish to determine whether he could get a one year contract, it was

12   Nunez who provided Fuentes with the terms upon which Dish would offer him services.

13   Therefore, the record supports the conclusion that Fuentes was the offeree.[4]  Because it is

14   undisputed that Fuentes made the call from his home, it was not done at Dish's "appropriate trade

15   premises."  The outcome would be the same if the Court accepts Fuentes' argument that the

16   parties did not form a contract until the technician presented him with the tablet following

17   installation.  Fuentes accepted the terms of that contract in his home, again placing it within the

18   scope of the HSSA.

19   Accordingly, Fuentes has demonstrated that his contract came within the scope of the

20   HSSA, and it GRANTS his motion and DENIES Dish's motion on this claim.

21   **D.     Dish Is Entitled to Judgment on the CTA Claim.**

22   It also is undisputed that Dish did not comply with the terms of the CTA.  The CTA

23   provides that that when a business negotiates specified contracts primarily in Spanish, as Dish did

24   here, he customer must be provided with a Spanish translation of the contract that includes every

25   term and condition in the contract before the customer executes the contract.  The CTA expressly

26   _____

27   [4]     The transcript also is subject to the interpretation that Fuentes believed he could cancel
without penalty after one year, and Nunez's remarks at the end do not clearly correct that
28   impression.  (8/6/15 Tr. at 35-36.)

1    includes contracts subject to the provisions of the Unruh Act.  Cal. Civ. Code § 1632(b)(1).

2          Fuentes claims his DHAP is a "retail installment contract" falling within the scope of the

3    Unruh Act.[5]  A retail installment contract under the Unruh Act is "any contract for a retail

4    installment sale between a buyer and seller, entered into or performed in this state, … which

5    provides for payment in more than four installments."  Cal. Civ. Code § 1802.6(b).  The phrase

6    "retail installment sale" requires that services are furnished "for a deferred payment price payable

7    in installments."  *Id.* § 1802.5.  Finally, the term "[d]eferred payment price means the total cash

8    price of the services including any finance charges."  *Crawford*, 160 Cal. App. 3d at 1169 (citing

9    Cal. Civ. Code § 1802.9).

10         Fuentes originally alleged that his DHAP met the definition of a retail installment contract

11   because the cancellation fee, which diminished each month, "reflects an amortization of the total

12   cost of the satellite TV service and related equipment, and is not a payment only for the service

13   and equipment provided that particular month."  (SAC ¶ 55.)  Fuentes now argues that because

14   Dish offered him a "teaser rate" for the first year of his service, and that the teaser rate combined

15   with the two-year term and cancellation fee allowed Dish deferred a portion of the total cost to the

16   second year, after the teaser rate expired.  (*See* Dkt. No. 168, Fuentes Opp. Br. at 12:14-22, 15:22-

17   24; *see also* Conn Opp. Decl., ¶ 6 (asserting amount deferred was $278.67).)

18         Civil Code section 1801.6(a) directs the Court to look to the substance, rather than the

19   form of the transaction to determine if it falls within the scope of the Unruh Act.  There is a dearth

20   of authority that is on point.  The parties' agreement is not the typical retail installment contract,

21   which usually would involve a large purchase (*e.g.,* a washing machine), where the customer

22   would make a down payment, incur a finance charge (defined in Civil Code section 1802.10), and

23

---

24   [5]      "The Unruh Act was enacted in 1959 for the purpose of correcting various abuses incident
     to the rapid and widespread growth of the consumer credit industry."  *King v. Central Bank*, 18
25   Cal. 3d 840, 843 (1977).  The act "proscribes a variety of unfair practices and requires complete
     disclosure to the consumer of the total cost for the purchase of goods and services under a retail
26   installment contract."  *Crawford v. Farmers Grp., Inc.*, 160 Cal. App. 3d 1164, 1168 (1984).
     Fuentes does not argue that Dish failed to comply with substantive provisions of the Unruh Act in
27   connection with the parties' transaction.  His sole claim is that Dish failed to comply with the
     CTA.
28

United States District Court
Northern District of California

United States District Court
Northern District of California

pay down the "amount financed" in installments over time.  *See, e.g., Siebert v. Sears, Roebuck & Co.*, 45 Cal. App. 3d 1, 6 (1975) (contrasting retail installment contracts with retail installment accounts, which also are covered by the Unruh Act).  Fuentes also did not obtain a contract that he could pay each month without incurring any further obligation to Dish if he chose to terminate his service.

In *Crawford*, the court examined whether an insurance contract that provided for monthly payments, plus a monthly service fee, on a six-month term policy was a retail installment contract under the Unruh Act.  160 Cal. App. 3d at 1168-69.  The court concluded it was not.  It reasoned the six-month term served to guaranty that plaintiff's monthly premiums would remain the same and that she would be covered, as long as she paid the premium on time.  Fuentes also was guaranteed that his monthly payments would remain the same for the first year and was also guaranteed fixed increase in price during the second year.  Unlike Fuentes, the plaintiff in *Crawford* "could and did terminate the policy without further obligation to defendants[.] … Plaintiff owed no underlying obligation, and a creditor-debtor relationship did not arise."  *Id.* at 1169; *accord Mackey v. Bristol W. Ins. Serv. of Cal.*, 105 Cal. App. 4th 1247, 1271 (2003) ("*Crawford* teaches that in the absence of any remaining balance or underlying debt, the purchase of a monthly insurance policy is not a credit sale within the meaning of the Unruh Act.").

Dish again relies on *Anderson v. Nextel Partners, Inc.*, 745 N.W.2d 464 (Iowa 2008).  In that case, the plaintiff purchased two cell phones and cell phone service from the defendant.  The parties agreed to a one-year term that allowed the plaintiff to cancel during that time, subject to $200 cancellation fee per phone.  The plaintiff lost one of her phones, cancelled her service, and refused to pay the cancellation fee, which she argued violated provisions of Iowa's Consumer Credit Code ("ICCC") that were applicable to "consumer credit sales."  *Id.* at 465-67.[6]  The ICCC's definition of credit included "the right granted by a person extending credit to a person … to purchase property or services and defer payment therefor."  *Id.* at 467 (quoting Iowa Code §

---

[6]     The purpose of the ICCC is nearly identical to the purpose of the Unruh Act: to protect consumers against unfair practices in connection with "retail installment sales and other consumer credit."  *Legg v. W. Bank*, 873 N.W.2d 763, 768 (Iowa 2016).

537.1301(a)(15)).

The court concluded the transaction did not fall within that definition. First, it determined that references in the agreement to credit and to the fact that defendant could rely on a credit check were not dispositive. *Id.* at 467-68 & n.8. It also reasoned that the plaintiff did not become indebted to the defendant for "the full year 'term,' but only for services already provided plus the early cancellation fee." *Id.* at 468. The court also relied on the fact that the plaintiff could not "defer payment of any monthly invoice for services" provided by the defendant. Even if that payment structure could be viewed as the extension of credit, the court reasoned that the "'debt' incurred each month was not payable in installments" as required by the ICCC. *Id.* at 468-69; *see also Legg*, 873 N.W.2d at 769 (referring to prior holdings that the "parties' agreement needed to grant the debtor the right to defer repayment in order for there to be an extension of credit"). As in *Anderson*, Fuentes could not defer payment for Dish's monthly services. However, unlike the cancellation fee in that case, Dish's early termination fee also diminishes over the life of a contract.

In *Adamson v. ADT, LLC*, the plaintiffs argued that the defendant's contracts were "consumer credit transactions" subject to the federal Truth in Lending Act ("TILA"). There, the plaintiffs entered into fixed term contracts for services, which required payment of an early termination fee, and like the fee here, the fee diminished over the life of the contract. No. CV 12-10558 DMG (PLAx), 2014 WL 12551405, at *1, 8 (C.D. Cal. Apr. 7, 2014). TILA defined a consumer credit transaction as "'credit offered or extended to a consumer primarily for personal, family, or household purposes', by a creditor." *Id.*, at *11 (quoting 12 C.F.R. § 226.2(a)(12)).[7] The court concluded there were disputed issues of fact about whether the contracts were subject to TILA, in part, because of the early termination fee. The court also noted that the record suggested the monthly fees were not limited to the services rendered each month and might include fees for

---

[7]     Under TILA, credit means "the right granted by a creditor to a debtor to defer payment of a debt or to incur debt and defer its payment." 15 U.S.C. § 1602(e). A "creditor" is defined, in part, as a person who "regularly extends … consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required[.]" 15 U.S.C. § 1602(g).

United States District Court
Northern District of California

installation and equipment.  *Id.*, at \*13 & n.7.

The *Adamson* court relied, in part, on a trial court opinion in which the court concluded that ADT's contracts were subject to the Unruh Act.  *Id.* (citing *People v. ADT Security Servs. Inc.*, Contra Costa County Superior Court No. C08-01301, Decision on Cross-Motions for Summary Adjudication (Nov. 6, 2009) ("*ADT*")).[8]  In *ADT*, the defendant argued its contracts were analogous to the insurance contract at issue in *Crawford*.  The court contrasted the situation presented in *Crawford* with a situation where "the 'buyer' must pay the full amount of the agreed consideration called for by the contract, whether or not he or she cancels or declines to receive further services."  *Id.* at 2.  It concluded the latter type of contracts are "considered to contain a hidden finance charge" and would be subject to the Unruh Act.  *Id.*  However, ADT's contracts did not fit squarely in either category because the cost of cancellation was less than the full value of the services provided.  *Id.* at 2-3.

The *ADT* court concluded the amount of the defendant's early cancellation fee was "much more than a simple 'service charge' for termination" and was more like a liquidated damages provision.  *Id.*, at 4.[9]  It determined that "when the provisions of the contract are such that in cancellation situations the contract can be construed to be a retail installment contract the Unruh Act is intended by the Legislature to apply even if there are alternate circumstances that might lead to a different conclusion."  *Id.*, at 4-5.

Fuentes relies on *Milwaukee Alarm Company, Inc. v. Chaney*, another case involving a fixed term contract for alarm services that included an early termination fee.  217 Wis. 2d 290, 577 N.W.2d 387 (1998) ("*Chaney*").  In that case, the early termination fee required the plaintiff to pay one half of the balance due for the fixed term period.  The issue before the court was whether the parties' contract extended credit under Wisconsin's Consumer Act ("WCA"), which defined credit

---

[8]     The *ADT* decision was filed as an exhibit to a declaration in *Adamson*.  *Id.*, 2014 WL 12551405, at \*12 (citing *Adamson* Docket No. 53-5).  This Court pulled the decision from the *Adamson* docket to review it.

[9]     California law provides that, in some instances, liquidated damages provisions are void. *See* Cal. Civ. Code § 1671.

United States District Court
Northern District of California

as "the right granted by a creditor to a customer … to incur debt and defer its payment" or "to purchase … services … on a time price basis." *Id.* at *1 & n.1.  The court reasoned that the contract fell within the scope of the WCA because it "obligated Chaney to pay a declining balance over and above the contracted-for value of the services he received, unless he carried the alarm service contract to full term." *Id.* at *2.  In that court's view, the plaintiff incurred debt when he signed the contract (either for the services not yet provided or, if he cancelled the contract early, for services that would never be provided) and was permitted to "defer" payment of that debt by carrying the contract to term.

As was the case in *ADT* and *Chaney*, the cancellation fee in Fuentes' contract would have been less than the total value of services he received from Dish.  While the Court expresses no view on the validity of the fee under other provisions of California law, the Court concludes that the facts here are distinguishable.  There is no suggestion in either of those cases that the defendants offered the plaintiffs any benefits in addition to their alarm services, such as the discounts and free services that Fuentes received as part of his contract.  (*See, e.g.,* Yin Decl., Ex. D (Orban Depo.) at 74:1-5, 75:16-76:24, 86:19-87:9, 97:21-98:4.)

In addition, the definitions of credit under the WCA and under TILA are broader than the definition of retail installment contract under the Unruh Act.  Indeed, as Dish notes, the court in *Chaney* did not analyze whether the contract in that case involved a "consumer credit sale," the definition of which is more in line with the Unruh Act's definition of retail installment contract. *Compare* Cal. Civ. Code § 1802.6 *with* Wis. Stat. § 421.301(9).  The Court also concludes the fact that Dish obtained permission from Fuentes to run a credit check is not dispositive of whether the DHAP qualifies as a retail installment contract. *Cf. Anderson*, 745 N.W.2d at 467-68 & n.8.

Finally, the Court finds that Fuentes' argument that Dish deferred the total cost of his service to the second year of his contract is unpersuasive.  Even taking the facts in the light most favorable to him, the record does not support a finding that his price during the first year was anything but a discount.  Although he proffers his estimate of the "deferred" payment, he makes no effort to show the "total sale price" of the contract nor what portion of his monthly bill qualified as the "cash price" and what portion of the bill would constitute a "finance charge," as

14

1    each of those terms are defined in the Unruh Act.

2         Accordingly, the Court GRANTS Dish's motion for summary judgment on the CTA

3    Claim.

4    **E.      The CLRA Claim.**

5         Fuentes alleged dish violated two provisions of the CLRA: (1) representing "that a

6    transaction confers or involves rights, remedies or obligations which it does not have or which are

7    prohibited by law[;]" and (2) "inserting an unconscionable provision in the contract."  Cal. Civ.

8    Code §§ 1770(a)(14), (19).  Dish argues Fuentes cannot prevail on either aspect of this claim.

9    Fuentes argues that disputed issues of material fact preclude summary judgment.

10        **1.      Section 1770(a)(14).**

11        Fuentes alleges that Dish violated subsection (a)(14) because it represented his contract

12   was final and binding when, in fact, he had the right to cancel under the HSSA.  (SAC ¶ 64(a).)

13   The parties agree that this claim is dependent on Fuentes' claim for direct violations of the HSSA.

14   Accordingly, the Court GRANTS Fuentes' motion for summary judgment on this aspect of the

15   CLRA Claim and DENIES Dish's motion.

16        **2.      Section 1770(a)(19).**

17        Fuentes alleges Dish violated subsection (a)(19) but does not argue that any particular

18   provision of his contract is unconscionable.  His claim is premised on the theory that Dish

19   negotiated the contract with him in Spanish but only provided him with an English language

20   version of the contract.  (SAC ¶ 64(b).)  Fuentes' theory does not comport with the plain language

21   of Section 1770(a)(19), which prohibits inserting a term or provision that is unconscionable into a

22   contract.  The word "insert" is defined as "to put … in" or "to put or introduce into the body of

23   something."  www.Merriam-Webster.com/dictionary/insert.

24        Fuentes argues that the Court should construe the term "insert" liberally, in light of the

25   CLRA's remedial purposes, and read that subsection to apply to contracts as a whole.  Fuentes

26   correctly notes that a contract may be unconscionable in its entirety, but he cites no authority

27   applying Section 1770(a)(19) to a contract as a whole.  *See, e.g., Bayol v. Zipcar, Inc.*, 78 F. Supp.

28   3d 1252, 1261 (N.D. Cal. 2015) (plaintiff challenged *provision* of rental car contract that provided

United States District Court
Northern District of California

1   for late fees; court declined to consider whether plaintiff stated claim under Section 1770(a)(19)).

2   Even if Fuentes' legal theory is viable, Fuentes must be able to show both procedural and

3   substantive unconscionability. *Armendariz v. Foundation Healthcare Servs., Inc.*, 24 Cal. 4th 83,

4   114 (2000). California courts apply a "sliding scale" analysis to determine unconscionability: "the

5   more substantively oppressive the contract term, the less evidence of procedural unconscionability

6   is required to come to the conclusion that the term is unenforceable and vice versa." *Poublon v.*

7   *C.H. Robinson Co.*, 846 F.3d 1251, 1260 (9th Cir. 2017) (quotations and citations omitted).

8   Fuentes argues there is a high degree of procedural unconscionability because he received an

9   English version of the contract. However, the majority of the cases on which Fuentes relies

10  involved employment contracts, which distinguishes them from the facts here. *See, e.g, Saravia v.*

11  *Dynamex, Inc.,* 310 F.R.D. 412, 420 (N.D. Cal. 2015); *Carmona v. Lincoln Millennium Car Wash,*

12  *Inc.*, 226 Cal. App. 4th 74, 84-85 (2014); *Samaniego v. Empire Today LLC*, 205 Cal. App. 4th

13  1138, 1145-46 (2012).

14  Fuentes, in contrast, contracted with Dish for non-essential recreational services, and

15  California courts have found that procedural unconscionability is lacking in such circumstances.

16  *See, e.g., Pokrass v. The Direct-TV Grp., Inc.,* No. EDCV 07-423-VAP, 2008 WL 2897084, at

17  * 6-*8 (C.D. Cal. July 14, 2008) (granting defendant's motion for summary judgment on claim for

18  alleged violation of Section 1770(a)(19) on basis that TV service was "non-essential recreational

19  activity" and finding no disagreement among California courts that contracts for such services

20  cannot be procedurally unconscionable); *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App.

21  4th 1224, 1245-46 (2007) (citing cases); *but see Lhotka v. Geographic Expeditions, Inc.*, 181 Cal.

22  App. 4th 816, 822 (2010) (looking to non-essential nature of services as one factor in evaluation of

23  procedural unconscionability). Fuentes also testified that he was able to recognize that the

24  document on the tablet included the number 24, rather than 12, and although he testified his wife

25  was in the shower, she was at home and available to help.

26  However, Fuentes was presented with the tablet after the equipment and wiring had been

27  installed, and testified that the technician told him to sign the document and to call Dish about the

28  two-year term. Based on these circumstances and the fact that there is no serious dispute that

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Dish's contract could be considered a contract of adhesion, the Court concludes Fuentes has

2   demonstrated some degree of procedural unconscionability.  *See, e.g., Cisneros v. Am. Gen. Fin.*

3   *Servs., Inc.*, No. C 11-02869 CRB, 2012 WL 3025913, at *19-22 (N.D. Cal. July 23, 2012)

4   (finding procedural unconscionability where Spanish speaking plaintiff was presented with

5   untranslated contract in her home and where she testified she felt only way to get sales

6   representatives to leave was to sign contract); *Lhotka,* 181 Cal. App. 4th at 824 (finding minimal

7   degree of procedural unconscionability in contract for recreational services where contract was

8   one of adhesion and plaintiffs were told other providers would have similar terms).

9          An agreement is substantively unconscionable where the results of the agreement are

10  overly "one-sided" or "harsh."  *Armendariz,* 24 Cal. 4th at 114.  Fuentes argues that because Dish

11  had a blanket right to change terms, to make a final determination on ambiguity, and because it

12  exculpated itself from liability, the terms of the DHAP are substantively unconscionable.  There

13  are no factual disputes that the DHAP contains these terms.  Fuentes fails to cite any authority to

14  support his position that these terms of are the type of terms that courts have found to be "so one-

15  sided as to shock the conscience."  *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1210 (9th Cir.

16  2016) (quotations and citations omitted).  Instead, he falls back on his argument that the contract is

17  procedurally unconscionable because he received an English language version of the DHAP

18         Accordingly, the Court GRANTS Dish's motion on this aspect of Fuentes' CLRA claim.

19  **F.     The UCL Claim.**

20         Fuentes argues that Dish's conduct is unlawful, fraudulent, and unfair.  This claim rests, in

21  part, on Fuentes' claims for violations of the HSSA, the CTA, and the CLRA.  Because the Court

22  concludes Dish is entitled to judgment in its favor on the CTA claim and on the CLRA claim, in

23  part, Dish is entitled to judgment, in part, in its favor on this claim.

24         Because the Court has found in favor of Fuentes on the HSSA claim and on the CLRA

25  claim, in part, he too is entitled to judgment, in part, in his favor on this claim.  Because the Court

26  concludes both parties are entitled to judgment in their favor based on violations of the unlawful

27  prong, it does not reach the question of whether Dish's conduct also violates the unfair or

28  fraudulent prongs of the UCL.

## CONCLUSION

For the foregoing reasons, the Court GRANTS, IN PART, AND DENIES, IN PART
Dish's motion for summary judgment.  The Court ORDERS the parties to appear on December 9,
2022, at 11:00 a.m. for a status conference, and they shall submit a joint status report on or before
December 2, 2022.

**IT IS SO ORDERED**.

Dated: November 15, 2022

_____
JEFFREY S. WHITE
United States District Judge